**WO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Harry D Richardson,<br><br>                 Plaintiff,<br><br>v.<br><br>State of Arizona,<br><br>                 Defendant. | No. CV-23-01675-PHX-SMB<br><br>**ORDER** |

The Court now considers Defendant State of Arizona's Motion for Summary Judgment (Doc. 57).  The Motion is fully briefed.  For the following reasons, the Court **grants** the Motion.

**I.     BACKGROUND**

Plaintiff Harry D. Richardson sues the State of Arizona for its Department of Economic Security, Office of Inspector General's (the "OIG") refusal to rehire him based on his spouse's disability.  (Doc. 27 at 5–7.)  The Court briefly introduces the key actors at the OIG.  During his time at the OIG, Plaintiff was supervised by Terrence Azbill, who was in turn, supervised by Anthony Lythgoe.  (Doc. 58 at 2 ¶ 3; Doc. 62 at 2 ¶ 3.)  John Meza was the Inspector General.  (Doc. 58 at 3 ¶ 10; Doc. 62 at 2 ¶ 10.)  Plaintiff alleges as follows.

Plaintiff worked for the OIG from October 24, 2016, until he resigned on October 8, 2019.  (Doc. 58 at 1 ¶¶ 1–2; Doc. 62 at 2 ¶¶ 1–2.)  During this time, Plaintiff's spouse's degenerative bone disease worsened.  (Doc. 27 at 3 ¶ 11.)  Plaintiff purports to have applied

for leave to care for his spouse in September 2019 under the Family and Medical Leave Act of 1993 ("FMLA"). (*Id.* ¶ 12.) Plaintiff had previously taken FMLA leave for his hip pain around February 2019. (Doc. 63 at 3 ¶ 9.) By October 2019, Plaintiff's spouse's health deteriorated to the point that Plaintiff resigned. (Doc. 27 at 3 ¶ 13.)

Plaintiff's spouse's condition stabilized by the summer of 2021. (*Id.* ¶ 14.) Plaintiff thus applied for his former position at OIG but he never received a response. (*Id.* ¶ 15.) Plaintiff was told by a former co-worker that Lythgoe, without explaining his reasoning, said he would not consider Plaintiff's application. (*Id.* at 3–41 ¶ 15.) During Plaintiff's employment, Lythgoe "would occasionally make negative remarks about Plaintiff's need to take FMLA leave or paid sick leave." (*Id.* at 3 ¶ 12.)

In August 2022, Plaintiff's former position was again advertised as open. (*Id.* at 4 ¶ 16.) Plaintiff applied, interviewed, and was told that he was a "top candidate." (*Id.*) Still, Plaintiff was not rehired. (*Id.* ¶ 16.) According to Plaintiff, Lythgoe advised against his rehire. (*Id.* ¶ 20.) Plaintiff also contends that other individuals:

> convinced the final decision-maker(s) not to hire Plaintiff because of his spouse's disability, [his] prior use of FMLA to care for his spouse when previously employed by DES/OIG, and the expectation that if rehired, Plaintiff would once again need to take time away from work to care for his spouse . . . under the FMLA when he once again became eligible.

(*Id.*) Accordingly, Plaintiff claims that Defendant violated the FMLA and the Rehabilitation Act of 1973. (*Id.* at 4–7.)

As to the FMLA claim, Plaintiff avers that Defendant violated the FMLA when it "decided not to rehire Plaintiff because of his prior use of FMLA leave during his previous employment and to preclude him from becoming" eligible for future FMLA leave. (*Id.* at 5 ¶ 27.) As to the Rehabilitation Act claim, Plaintiff contends that "Defendant discriminated against Plaintiff by excluding him from consideration and refusing to rehire him to his former position . . . because of his association with an individual with a disability (his spouse)." (*Id.* at 7 ¶ 35.) Defendant seeks summary judgment on both claims.

**II.    LEGAL STANDARD**

Summary judgment is appropriate in circumstances where "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of a case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by showing "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Additionally, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255. Additionally, the Court does not make credibility determinations or weigh the evidence. *Id.* The determination of whether a given factual dispute requires submission to a jury is guided by the substantive evidentiary standards that apply to the case. *Id.*

The burden initially falls on the movant to demonstrate the basis for a motion for summary judgment and "identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. If this initial burden is not met, the nonmovant does not need to produce anything even if they would have the ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). However, if the initial burden is met by the movant, then the nonmovant has the burden to establish that there is a genuine issue of material fact. *Id.* at 1103. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material issue of fact, and "[i]f the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III.   DISCUSSION

The Court first considers Plaintiff's FMLA claim.   Then the Court considers Plaintiff's Rehabilitation Act claim.  The Court finds that Defendant is entitled to judgment as a matter of law as to both claims.

### A.  FMLA

The Court begins with Plaintiff's FMLA claim.  Plaintiff claims that Defendant violated the FMLA when it refused to rehire him based on: (1) "Plaintiff's use for approved FMLA leave to care for his spouse when he was employed be [sic] DES/OIG between October 2016 and October 2019"; and (2) to preclude him from "becom[ing] eligible for FMLA leave to care for a spouse . . . after he was employed."  (Doc. 27 at 5 ¶¶ 24, 26.) The Court first clarifies that the FMLA tolerates the first aspect of Plaintiff's FMLA claim but not the second.  Then, the Court analyzes whether Plaintiff raises a triable issue as to whether he used FMLA leave to care for his spouse.  The Court finds that Plaintiff fails to do so and only establishes that he took FMLA leave to care for himself.  Thus, the Court concludes that Plaintiff's FMLA claim fails as a matter of law because Defendant is immune from such claims under the doctrine of sovereign immunity.

#### 1.  *Legal Framework*

Congress passed the FMLA to "provide[] job security to employees who must be absent from work because of their own illnesses, to care for . . . family members who are ill, or to care for new babies." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1119 (9th Cir. 2001).  "The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave."  *Id.* at 1122 (citing 29 U.S.C. §§ 2612(a), 2614(a)).  To enforce these rights, "the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the [FMLA],

and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the [FMLA]." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citations omitted) (citing 29 U.S.C. § 2615(a)); *see also Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011)) (recognizing two theories for recovery under the FMLA).[1]

Here, Plaintiff alleges that the OIG violated the FMLA when it declined to rehire him based on his "prior use or intended use of FMLA leave." (Doc. 61 at 8.) Under the FMLA, an employer may not consider "an employee's use of FMLA-covered leave in making adverse employment decisions." *Bachhelder*, 259 F.3d at 1122. As relevant here, "[e]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring." *Id.* (emphasis omitted) (quoting 29 C.F.R. § 825.220(c)). Courts consider these claims as interference claims. *See, e.g.*, *id.*; *Jadwin v. County of Kern*, 610 F. Supp. 2d 1129, 1159 (E.D. Cal. 2009).

Courts use different standards to evaluate interference. Generally, an employee makes a prima facie case of FMLA interference when he establishes that "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014). Defendant relies on this test. (Doc. 57 at 5.) However, this test—particularly the fifth factor—is a poor fit here given that Plaintiff's claim does not involve the denial of FMLA benefits. *See Sanders*, 657 F.3d at 778 (noting that the five-factor test is applied in cases "where the employer fails to reinstate the employee" after using FMLA leave).

Instead, Plaintiff argues that his prior and potential future use of FMLA leave motivated the OIG not to rehire him. (Doc. 61 at 8.) "To establish this type of interference claim under the FMLA, a plaintiff must show that (1) he took 'FMLA-protected leave';

---

[1] "While the FMLA does not clearly delineate these two claims with the labels 'interference' and 'retaliation,' those are the labels courts have used in describing an employee's claims under the [FMLA]." *Sanders*, 657 F.3d at 777 (quoting *Strickland*, 239 F.3d at 1206 n.9).

and (2) it constituted 'a negative factor' in an adverse employment decision." *Jadwin*, 610 F. Supp. 2d at 1159 (citation modified).  The Court presumes that the first element of this latter test incorporates the first four elements of the former test.  However, the last factor of each test asks a different question.

The Court highlights these tests because Defendant's application of the five-factor test has led Defendant astray—at least in part.  Defendant argues, relying on the fifth factor of the five-factor test, that Plaintiff's FMLA claim fails because he was ineligible for FMLA benefits at the time of his reapplications.  (Doc. 57 at 5.)  In particular, Defendant argues that:

> [Plaintiff] was not eligible for FMLA protections through Defendant at the time of his years-later/2022 reapplication process. He gave no notice of any intent to take any such FMLA leave as part of his years-later/2022 reapplication process. He did nothing to entitle him to take any such FMLA leave as part of his years-later/2022 reapplication process, and correlatively as part of his years-later/2022 reapplication process DES/OIG did not deny him any such FMLA leave to which he was entitled.

(Doc. 57 at 5.)  Defendant is only partially correct.

Defendant is correct only insofar as its arguments relate to Plaintiff's claim that Defendant violated the FMLA by not hiring Plaintiff based on his "possible future use" of FMLA leave.  (Doc. 61 at 10.)  The FMLA does not tolerate such claims.  FMLA claims are predicated on "the exercise of or the attempt to exercise, any right provided by the [FMLA]." *Bachelder*, 259 F.3d at 1122 (citation modified).  Accordingly, "a valid FMLA claim must be based on FMLA leave already taken" or attempted to be taken.  *See Lyons v. Safeway, Inc.*, No. CV 05-1231-PHX-MHM, 2007 WL 809987, at *9 (D. Ariz. Mar. 15, 2007).  Thus, Plaintiff's FMLA claim fails as a matter of law insofar as it is based on the speculative future use of FMLA benefits.[2]

However, Plaintiff's FMLA claim is also predicated on Defendant considering his previous FMLA leave in not rehiring him.  Plaintiff's FMLA eligibility at the time of his

---

[2] "The FMLA entitles qualifying employees to take unpaid leave for up to 12 weeks each year provided they have worked for the covered employer for 12 months." *Lyons*, 2007 WL 809987, at *8 (citing § 2612(a)).  Thus, Plaintiff's claim is based, in part, on the assumption that he would work for twelve months and would thereafter use FMLA leave to care for his spouse.

applications is irrelevant in assessing whether Defendant used Plaintiff's previous FMLA leave as a negative factor in an adverse employment decision. *See Jadwin*, 610 F. Supp. 2d at 1159. Now that the table is set, the Court considers whether this remaining facet of Plaintiff's FMLA claim survives summary judgment.

### 2. *Summary Judgment Analysis*

The Court briefly revisits the relevant facts. During his time at the OIG, Plaintiff contends that he took FMLA leave and "applied for leave under the FMLA in September 2019" to care for his spouse. (Doc. 27 at 3 ¶ 12.) Plaintiff contends he was not rehired due to his prior FMLA leave. (*Id.* at 5 ¶ 27.)

Again, Plaintiff must show that (1) he took FMLA leave and (2) that such leave motivated the OIG not to rehire him. *See Jadwin*, 610 F. Supp. 2d at 1159. Ultimately, Plaintiff's claim fails because he does not present any triable issue as to the first element.

Defendants do not, as a general matter, contest that Plaintiff took FMLA leave. Plaintiff contends, and Defendants agree, that Plaintiff "used FMLA leave for [his] own medical issue when [he] broke [his] hip in or around February 2019." (Doc. 62 at 3 ¶ 9.) Indeed, Defendant produces time records establishing that Plaintiff "used FMLA leave one time, for self-care for 2 weeks and 2 days/96 hours (February 25, 2019–March 12, 2019)." (Doc. 58 at 4 ¶ 14.)

However, Defendants contest the type of FMLA leave that Plaintiff took. Defendants suggest that Plaintiff never "completed and submitted the required FMLA leave paperwork for FMLA leave time *pertaining to care of a family member/his spouse*, much less was ever approved for, denied, and/or used any such FMLA leave time." (*Id.* ¶ 12 (emphasis added).) In response, Plaintiff argues that "[i]t is irrelevant whether the prior use on [sic] FMLA leave when previously employed was for himself or a family member." (Doc. 61 at 9.) However, this distinction is relevant this case as the type of FMLA leave taken implicates sovereign immunity concerns.

"States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense." *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 35 (2012). However,

"Congress may abrogate the States' immunity from suit pursuant to its powers under § 5 of the Fourteenth Amendment." *Id.* Congress did so in enacting the FMLA. *Id.* at 33. However, the Supreme Court has found that FMLA's abrogation of sovereign immunity was only partially constitutional. *See, e.g.*, *id.*; *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003). To appreciate the import of the Supreme Court's findings, the Court must explain the different types of FMLA leave.

> Under the FMLA, an employee may take leave for:
> (A) the birth of a son or daughter in order to care for such son or daughter,
> (B) the adoption or foster-care placement of a child with the employee,
> (C) the care of a spouse[,] son, daughter, or parent with a serious health condition, or (D) the employee's own serious health condition when the condition interferes with the employee's ability to perform at work

*Coleman*, 566 U.S. at 34 (citation modified) (quoting § 2612(a)(1)). These first three categories are the "family-care provisions" and the last category is the "self-care provision." *Id.* In *Hibbs*, the Supreme Court held that States are subject to suit for violations of the family-care provisions. 538 U.S. 721. But the Supreme Court reached the opposite holding regarding the self-care provision in *Coleman*. 566 U.S. at 33. There, the Supreme Court found that Congress did not "abrogate the States' immunity from suits for damages . . . when it allowed employees to sue States for violations of the FMLA's self-care provision." *Id.* at 43–44. Thus, Defendant is immune from Plaintiff's FMLA suit insofar as it is predicated on his self-care leave.

The Court thus returns to Defendant's argument that Plaintiff never took family-care leave. On the one hand, Plaintiff alleges that he merely "applied" for FMLA leave in September 2019 to care for his wife. (Doc. 27 at 2 ¶ 12.) On the other hand, Plaintiff refers to his "prior use of FMLA to care for his spouse when previously employed by [OIG]." (*Id.* at 3 ¶ 20.) Ignoring this apparent contradiction, Plaintiff fails to present any evidence establishing either assertion.

In its Statement of Facts, Defendants contend that Plaintiff, during his tenure at OIG, only used two weeks of self-care leave for his hip. (Doc. 58 at 3–4 ¶¶ 11–14.) Defendant corroborates this assertion with a declaration by Jennifer Goetzke, OIG's Deputy Chief

Human Resources Officer. (Doc. 58-1 at 2 ¶ 2, 3 ¶ 6.) Goetzke declares that "Plaintiff's daily time records and related documents for the entire time period that he was a DES/OIG employee show that all (of the minimal) FMLA leave hours that he took were for self-care/care of himself (Code 310F) and not for care of a family member/his spouse (Code 311F)." (*Id.* at 3 ¶ 6.) Goetzke corroborates her statement with Plaintiff's Historical Daily Time Records (the "DTR"), which only shows that Plaintiff took self-care leave, not family-care leave. (*Id.* at 73.) Additionally, the DTR lists Plaintiff's time records from November 2016 until October 2019, and shows that Plaintiff took self-care leave from February 25, 2019, until March 12, 2019. (*Id.* at 73–74.) The DTR does not reflect that Plaintiff took any other FMLA leave. This is corroborated by Plaintiff's Declaration, in which he states that "used approximately two and a half weeks of FMLA leave from the time of my surgery, on or around February 25, 2019 to March 12, 2019." (Doc. 63 at 3–4.)

Plaintiff fails to offer a convincing rebuttal. To start, Plaintiff admits that he did not submit a "formal FMLA request specifically mentioning leave to care for a family member." (Doc. 62 at 2–3 ¶ 12.) Plaintiff also admits that the DTR is "coded to show when he used vacation time, sick time and FMLA leave." (*Id.* at 2 ¶ 11.) More fundamentally, Plaintiff does not even offer approximate dates when he took FMLA leave to care for his spouse. This omission is noteworthy given that he was able to do so for his self-care leave. Additionally, Plaintiff, in his Declaration, does not contend that he took FMLA leave to care for his spouse. (Doc. 63.) Instead, Plaintiff only avers that he "considered reapplying for FMLA leave" during the summer of 2019. (*Id.* at 5 ¶ 14.) Accordingly, the Court finds that Plaintiff fails to present any evidence creating a triable issue as to whether he took family-care leave.

Thus, Plaintiffs' FMLA claim is reduced to an interference claim based on Plaintiff not being rehired due to taking self-care leave. As such, Plaintiff's claim fails because Defendant, as a sovereign, is immune from suits brought pursuant to the FMLA's self-care provision. Defendant expressly invoked its immunity insofar as Plaintiff's claims were "based on leave that Plaintiff took to address his own medical issues." (Doc. 30 at 2 ¶ 5.)

- 9 -

Plaintiff does not argue that Defendant waived its immunity.

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's FMLA claim.

### B. Rehabilitation Act Claim

The Court now addresses Plaintiff's claim under § 504 of the Rehabilitation Act, 29 U.S.C. § 794. (Doc. 27 at 7 ¶ 35.) Again, Plaintiff claims that Defendant violated the Rehabilitation Act when it decided not to rehire him based on his spouse's disability.

The Rehabilitation Act prohibits discrimination in federally funded programs against an individual "solely by reason of her or his disability." § 504(a). "[D]istrict courts in the Ninth Circuit, along with other Circuit courts, have held that [the Rehabilitation Act] allow[s] non-disabled individuals to bring associational discrimination claims." *Espino v. Regents of the Univ. of Cal.*, 666 F. Supp. 3d 1065, 1084 (C.D. Cal. 2023) (collecting cases).[3] Generally, a prima facie showing of employment discrimination under § 504 requires a claimant to show that "(1) he is an individual with a disability, (2) he is otherwise qualified for the position, and (3) he suffered adverse employment action because of his [associate's] disability." *See Liu v. DeJoy*, 664 F. Supp. 3d 1030, 1041 (C.D. Cal. 2023). Defendant does not contest Plaintiff's qualifications or whether his spouse is disabled.

To establish the third element for a § 504 associational discrimination claim, claimants "must allege a specific, direct, and separate injury resulting from their association with a disabled individual." *Espino*, 666 F. Supp. 3d at 1084. "Where . . . a plaintiff seeks compensatory damages under Section 504, they must clear an additional hurdle: proving a mens rea of intentional discrimination which may be met by showing deliberate indifference." *Id.* at 1086 (citation modified).

---

[3] Defendant, in its Reply brief, argues that Plaintiff fails "to show that a cause of action for associational disability discrimination unambiguously exists under the Rehabilitation Act." (Doc. 65 at 8.) Defendant raises this argument for the first time in its Reply. The Court "need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). Still, the Court sees no reason to depart from *Espino* and the litany of other courts which have found that the Rehabilitation Act creates a cause of action for associational disability discrimination. The Court also questions Defendant's reliance on *Smith v. Michigan Department of Corrections*, 159 F.4th 1067 (6th Cir. 2024), a Sixth Circuit case holding that § 504 "does not provide a cause of action for *retaliation*." *Id.* at 1085 (emphasis added).

Thus, the question here is whether Plaintiff presents enough evidence demonstrating that he was not rehired due to his wife's disability. *See Liu*, 664 F. Supp. 3d at 1041. "In the Ninth Circuit, disability discrimination claims are analyzed under the same burden shifting analysis as applied in Title VII claims, set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Liu*, 664 F. Supp. 3d at 1041; *see also Vangieson v. Austin*, No. 22-55998, 2024 WL 771703, at *1 (9th Cir. Feb. 26, 2024) ("We apply the *McDonnell Douglas* burden-shifting framework to discrimination claims under the Rehabilitation Act."). "Under this test, if the plaintiff makes out a prima facie showing of disability discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decisions." *Liu*, 664 F. Supp. 3d at 1041. "[I]f the employer disclaims any reliance on the employee's disability in having taken the employment action" the *McDonnell Douglas* framework "should be used to determine if the employer's reason is pretextual." *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1175 (9th Cir. 1998). The Court thus applies this three-part framework as follows.

### 1. *Step 1*

The Court first assesses whether Plaintiff states a prima facie case of disability discrimination by showing that he was not hired due to his wife's disability. *See Liu*, 664 F. Supp. 2d at 1051. To do so, the Court must first address two preliminary issues: § 504's causation standard and the cat's paw theory of liability.

### a. § 504 Causation Standard

As to the causation standard, Courts are split on whether § 504's causation requirement is more stringent than discrimination claims brought under the Americans with Disabilities Act of 1990 ("ADA"). This split is generated by § 504(a) stating that no person shall be discriminated against "*solely* by reason of her or his disability." (Emphasis added). However, § 504(d) goes on to provide that the standards used to evaluate employment discrimination claims under the Rehabilitation Act "shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of

1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment." The Court in *Natofsky v. City of New York*, 921 F.3d 337 (2d Cir. 2019) explained the tension between these two provisions as follows:

> The Rehabilitation Act provides that no individual shall be subject to discrimination in any program or activity receiving federal financial assistance "*solely by reason* of her or his disability." [§ 504(a)] (emphasis added). This language differs from the ADA, which makes it unlawful for an employer to discriminate against an individual "*on the basis of* disability." 42 U.S.C. § 12112(a) (emphasis added). Although the two acts appear to have different causation standards, Congress amended the Rehabilitation Act in 1992 to add a provision which states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination ... shall be the standards applied under title I of the Americans with Disabilities Act of 1990." [§ 504(d)].

*Id.* at 344–45. *Natofsky* ultimately held that the ADA's "but-for" standard of causation applies to Rehabilitation Act employment discrimination claims. *Id.* at 354. The court reasoned that "[§ 504(d)] is, in our opinion, more specific than [§ 504(a)] and, therefore, displaces the causation standard expressed in [§ 504(a)] in the employment discrimination context." *Id.* at 345. Other courts, such as the Seventh Circuit disagree, holding that the "Rehabilitation Act has a stricter causation requirement: the . . . disability must be *the sole* reason for the alleged discriminatory action; this contrasts with the ADA, which requires only that the . . . disability be *a reason* for the challenged action." *Royan v. Chi. State Univ.*, 145 F.4th 681, 689 (7th Cir. 2025) (emphasis added).

The Ninth Circuit has not specifically addressed this issue. However, it has recognized that the "standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the [ADA]." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 884 (9th Cir. 2004) (citing § 504(d)). Given this recognition, and the inherent persuasiveness of *Natofsky*, this Court opts to adopt the Second Circuits interpretation of § 504. This Court is not the first district court in this Circuit to adopt the ADA's but-for standard of causation in evaluating claims under the Rehabilitation Act. *See, e.g.*, *VanGieson v. Austin*, No. 20-cv-01033-LAB (MDD), 2022 WL 16571125, at *4 (S.D. Cal. Sept. 27, 2022), *aff'd*, No. 22-55998, 2024 WL 771703

(9th Cir. Feb. 26, 2024); *Liu*, 664 F. Supp. 3d at 1048.

### b. Cat's Paw Theory

The Court turns next to the cat's paw theory. "Under the cat's paw theory, the discriminatory intent of a subordinate employee can be imputed to a final decisionmaker if the decisionmaker acted as the conduit of the employee's prejudice—his cats paw—despite the innocence of the decisionmaker." *Sanders v. Bay Area Air Quality Mgmt. Dist.*, No. 23-cv-04416-RFL, 2025 WL 3038993, at *5 (N.D. Cal. Oct. 30, 2025) (citation modified).[4] Here, Plaintiff's claim primarily turns on whether Lythgoe acted with discriminatory animus in advising Meza not to rehire Plaintiff based on his wife's disability. (Doc. 61 at 13 n.3.) Plaintiff does not dispute that Meza made the ultimate decision not to hire him; neither does Plaintiff dispute that Meza was unaware of Plaintiff's spouse's disability. Indeed, Plaintiff argues that "Defendant can claim no safe-harbor by arguing that Meza was the final decision-maker." (*Id.*) Thus, Plaintiff asserts a "cat's paw" theory of liability. (*Id.*) With the foregoing issues in mind, the Court now assesses whether Plaintiff sufficiently establishes that his spouse's disability was the but-for reason behind his not being rehired.

### c. Step 1 Analysis

To start, it is undisputed that there were no issues with Plaintiff's performance during his time at the OIG. (Doc. 62 at 4.) Additionally, Plaintiff was not marked as ineligible for rehire when he retired. (*Id.* at 8 ¶ 43; Doc. 62-3 at 28; Doc. 62-2 at 18.) Plaintiff also presents internal OIG emails noting that Plaintiff is "the clear and obvious choice for this position and the [interview] panel's recommendation." (Doc. 62-4 at 3.) The Court acknowledges that positive performance evaluations can play a key role in employment discrimination cases. *See, e.g.*, *Ader v. SimonMed Imaging Inc.*, 465 F. Supp. 3d 953, 976 (D. Ariz. 2020). However, its relevance is minimized here given that Defendant does not contend that Plaintiff was not rehired based on performance issues. As

---

[4] It is unclear whether the cat's paw theory applies to Rehabilitation Act claims. *Carr v. Garland*, No. 2:19-cv-9112-CBM (JEMx), 2022 WL 17549781, at *8 n.12 (C.D. Cal. Nov. 3, 2022), *aff'd*, No. 22-56135, 2024 WL 1007504 (9th Cir. Mar. 8, 2024) (noting that it failed to find any cases "applying the cat's paw theory to Rehabilitation Act claims").

the Court will discuss in more detail below, Defendant contends that it did not rehire Plaintiff based on the facts surrounding his abrupt resignation. (Doc. 57 at 6.) Thus, Plaintiff's ability to perform the job does little to demonstrate that his spouse's disability was the but-for cause of his not being rehired.

Plaintiff goes on to provide in his Declaration that after he was turned down, Azbill called Plaintiff and told him that Lythgoe had "shot down the recommendation that [he] be hired for the position." (Doc. 63 at 8 ¶ 26.) The Court is dubious of this assertion given that Azbill, when asked whether he "recall[ed] having any conversation with Mr. Lythgoe about rehiring Mr. Richardson in the fall of 2022," responded that he "wouldn't have talked to [Lythgoe]." (Doc. 62-2 at 13.)

Nevertheless, the Court turns to the evidence surrounding Lythgoe and the OIG's knowledge of Plaintiff's spouse's disability generally. As one court put it, "it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot [discriminate against] an employee 'because of' a disability unless it knows of the disability." *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir. 1996); *see also Foster v. City of Oakland*, 649 F. Supp. 2d 1008, 1018 (N.D. Cal. 2009) ("To prove an ADA . . . claim, a plaintiff must prove that the employer had knowledge of the employee's disability when the adverse employment decision was made." (citation modified).) Plaintiff contends that he "has presented evidence from which a reasonable trier of fact could find that DES/OIG knew Plaintiff's wife was disabled and had a serious health condition at the time he was under consideration for rehire in 2022."[5] (Doc. 61 at 13.)

---

[5] Briefly, Court is not convinced that an associational disability discrimination claim can stand when an employer only knows that a person has a "serious health condition" without knowing anything about the condition, only that a person has an unnamed health condition that is "serious." There might be instances where knowledge of a "serious health condition" supports an inference that someone is disabled based on known health conditions. *See Velasquez v. Constellation Brands US Operations, Inc.*, No. 1:18-cv-00364-SAB, 2019 WL 2642510, at *9 (E.D. Cal. June 27, 2019) ("[A]n employer can still be found liable for disability discrimination in cases where knowledge of a disability can be inferred." (citation modified).) However, it is not clear that such an inference can be drawn where an employer merely knows that someone has a serious health condition

Beginning with Lythgoe, Plaintiff cites to an email he sent to Lythgoe in response to a meeting invitation purportedly suggesting that he knew of Plaintiff's wife's disability. (Doc. 62 at 6 ¶ 33.)  In this email, he notified Lythgoe that he was unable to attend the meeting because of a "prior commitment for [his] wife's 08:30 Dr's appointment and completion of FMLA paperwork." (Doc. 58-1 at 29.)  Plaintiff also cites to Lythgoe's deposition testimony. (Doc. 61 at 13; Doc. 62 at 6 ¶¶ 33–34.)  Lythgoe, when asked whether he "discussed the health of Mr. Richardson's spouse with him," responded that he didn't "remember ever having a conversation with him about his wife's health, other" then the aforementioned email. (Doc. 62-2 at 26–27.)  Lythgoe additionally testified that "[t]here may have been some conversation in the office about maybe [Azbill] mentioning that [Plaintiff's spouse] had some health issues." (*Id.* at 26.)  Notably, Azbill only testified that Plaintiff's spouse "had problems" but he did not have any recollection of her "suffering from any kind of health condition, such as a degenerative bone disease." (Doc. 62-2 at 20.)  Additionally, Lythgoe went on to testify that he was unaware that Plaintiff resigned to take care of his wife. (*Id.* at 28, 36.)

This evidence, even construed generously, fails to establish that Lythgoe knew that "Plaintiff's wife was disabled and had a serious health condition." (Doc. 61 at 13.)  The cited evidence merely establishes that: (1) Lythgoe knew that Plaintiff had to attend at least one medical appointment with his spouse; and (2) that the OIG staff might have discussed Plaintiff's spouse having some health issues.  This does not establish that Lythgoe had actual knowledge of Plaintiff's spouse's degenerative bone disease.  Neither does this evidence establish that Lythgoe had constructive knowledge of Plaintiff's spouse's disability.  As one court noted:

> While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts.  Vague or conclusory

but does not have any information about that condition or its symptoms.  Nonetheless, Plaintiff fails to establish that anyone involved in not rehiring knew of his spouse's degenerative bone disease or otherwise had information from which it could be inferred that Plaintiff's spouse was disabled within the meaning of the Rehabilitation Act.

statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under . . . the ADA.

*Alejandro v. ST Micro Elecs., Inc*, 129 F. Supp. 3d 898 (N.D. Cal. 2015) (citation modified). At bottom, Plaintiff's cited evidence is vague, conclusory, and arguably does not even rise to the level of revealing an unspecified incapacity. Thus, the Court finds that there is no evidence sufficient to put Lythgoe on notice that Plaintiff's spouse was disabled.

Plaintiff also claims that Deputy Inspector General Jonny Cervantes was aware of his spouse's medical issues based on an email Plaintiff sent in May 2020 regarding applying for his previous job. (Doc. 61 at 13; 63 at 8 ¶ 45; Doc. 63-2 at 2.) In this email, Plaintiff stated: "The personal and medical issues that resulted in my need to resign have been rectified. Therefore, I would like to return to my old job within the DES IG's CCA Fraud Unit." (Doc. 63-2 at 2.) It is unclear why Plaintiff cites this email as it does not even mention his spouse. Neither did Cervantes understand Plaintiff's email to be related to his spouse. Cervantes responded to Plaintiff by saying, "Hello Harry I am glad to hear *you* are doing well." (*Id.* (emphasis added).) Cervantes's response email does not mention Plaintiff's spouse. Although Plaintiff argues there is "sufficient circumstantial evidence from which a trier of fact could find that Cervantes was aware that Plaintiff was referring to his wife's medical condition," Plaintiff does not direct this Court to that evidence. (Doc. 61 at 5.) Thus, the Court finds that there is no evidence sufficient to put Cervantes on notice that Plaintiff's spouse was disabled. At best, Plaintiff's evidence establishes that certain actors at the OIG were aware of the general fact that Plaintiff's spouse had an unspecified illness.

Thus, there is no evidence from which these actors could fairly assume that Plaintiff's spouse was disabled under the Rehabilitation Act. Accordingly, the Court finds that summary judgment is appropriate on Plaintiff's rehabilitation claim. However, even assuming Plaintiff met his step-1 burden, the Court is otherwise dubious of whether Plaintiff could satisfy the remaining steps.

### 2. *Step 2*

As to the second step, Defendant sufficiently "articulate[d] a legitimate, nondiscriminatory reason for its decisions." *Liu*, 664 F. Supp. 3d at 1049. Defendant argues that Plaintiff was not rehired "due to the unprofessional way that Plaintiff had previously left his DES/OIG investigation supervisor position." (Doc. 57 at 4.) Defendants point to evidence from which a trier of fact could indeed infer this was the reason Lythgoe recommended that Plaintiff not be rehired.

The following facts are undisputed. On October 7, 2019, Lythgoe sent a meeting invite to Plaintiff for a 9:00 am meeting the following morning. (Doc. 58 at 2 ¶ 3; Doc. 62 at 2 ¶ 3.) As noted, Plaintiff responded saying that he could not attend the meeting due to his wife's 8:30 am medical appointment but that he would be doing his work day thereafter. (Doc. 58 at 2 ¶ 4; Doc. 62 at 2 ¶ 4.) Lythgoe responded, requesting that Plaintiff let him know when he was free so they could reschedule the meeting. (Doc. 58 at 2 ¶ 5; Doc. 62 at 2 ¶ 5.) Shortly after 9:00 am, Lythgoe sent Plaintiff another meeting invite, proposing a 2:00 pm meeting. (Doc. 58 at 2 ¶ 6; Doc. 62 at 2 ¶ 6.) Just before 12:30 pm, Plaintiff sent Lythgoe his resignation email, which stated:

> This is to inform you that I hereby resign my position as Special Investigations Sergeant with the AZ Department of Economic Security Office of Inspector General effective immediately. I will drop off all DES issued property on Thursday 10 October 2019, upon my return to Phoenix.

(Doc. 58 at 2–3 ¶ 7; Doc. 58-1 at 33; Doc. 62 at 2 ¶ 7.) Defendants produce evidence showing that Lythgoe responded to this email, asking for Plaintiff to call him. (Doc. 58-1 at 38.) Although Plaintiff disputes whether Lythgoe sent additional communications, (Doc. 62 at 2 ¶ 9), Plaintiff does not contend that he called Lythgoe or responded to his email. This evidence corroborates Defendant's assertion that Plaintiff was not rehired due to his "same/day/no notice/no explanation resignation." (Doc. 58 at 3.) This evidence sufficiently sets forth a legitimate, nondiscriminatory basis for not rehiring Plaintiff.

### 3. *Step 3*

At the third step, the burden would shift to Plaintiff to establish that Defendant's stated reasons for not rehiring Plaintiff are pretext for discrimination. *Liu*, 664 F. Supp. 3d

- 17 -

at 1049.  To satisfy his burden, Plaintiff must either: (1) directly "persuad[e] the [C]ourt that a discriminatory reason more likely motivated the employer"; or (2) indirectly "show[] that the employer's proffered explanation is unworthy of credence." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).  "To prevent summary judgment, [Plaintiff] may rely on circumstantial evidence to show pretext, but 'such evidence must be both specific and substantial.'" *Liu*, 664 F. Supp. 3d at 1049 (quoting *Villiarimo*, 281 F.3d at 1062).

Although an exhaustive step-3 analysis is unnecessary here, the Court notes that Plaintiff fails to present specific and substantial evidence to demonstrate pretext.  At the outset, the Court notes that its previous discussion regarding the OIG's knowledge of Plaintiff's spouse's disability, even if sufficient to establish a prima facie case of discrimination, is not so "specific and substantial" to demonstrate pretext.

That aside, Plaintiff argues the Defendant's stated reason for not rehiring Plaintiff is pretext based on "evidence of inconsistent and contradictory explanations for the reason not to hire Plaintiff." (Doc. 61 at 15.)  Plaintiff relies on the fact that Defendant, in response to a charge filed by Plaintiff with the Equal Employment Opportunity Commission ("EEOC"), claimed that it didn't hire Plaintiff based the following:

> (1) That Plaintiff's background and reference check which revealed that Mr. Richardson failed to adhere to the expected standards of conduct while employed with the Department and did not provide adequate notice of his resignation in compliance with the state rules . . . and (2) that Plaintiff had been issued a memorandum of concern in April of 2019 during his employment for alleged excessive speeding in a state vehicle.

(Doc. 62 at 10–11 ¶ 55.)  First, Plaintiff mischaracterizes the OIG's stated reasons for not rehiring him.  Defendant's EEOC Position Statement provides "that OIG decided not to move forward with rehiring Mr. Richardson for two reasons": (1) for reasons related to the excessive speeding; and (2) for Plaintiff's failure to provide adequate notice of his resignation.  (Doc. 62-4 at 18.)  Plaintiff attempts to cast a "background and reference check" as a separate reason for his not being rehired; however, Defendant's EEOC Position Statement makes clear that the background and reference check revealed the excessive

speeding information.  (*Id.* at 19.)

With this clarification in mind, the Court notes that Defendant maintains that Plaintiff was not rehired due to his method of resignation.  In this way, the EEOC Position Statement evidences Defendant's consistency.  It appears that Plaintiff takes issue with the EEOC Position Statement insofar as it states that Plaintiff was not rehired due to his failure to provide his resignation "at least 10 business days prior to the effective date of the resignation" "as required by State Personnel System Rule R2-5A-1001." (*Id.* at 18.)  It is not entirely clear what Plaintiff's contention is.  However, whatever qualms Plaintiff might have surrounding this rule, it is not inconsistent with Defendant's claim that Plaintiff was fired based on his same-day no explanation resignation.

The Court recognizes that Meza, in his deposition, testified that he was unaware of the speeding incidents when deciding not to hire Plaintiff.  (Doc. 58-1 at 57.)  However, the Court questions the probative value of this "inconsistency" given that Plaintiff does not claim that Meza harbored any discriminatory animus towards Plaintiff.  As made clear, Plaintiff contends that Lythgoe's discriminatory animus should be imputed on Meza under the cat's paw theory.  However, Plaintiff does not present any evidence that Lythgoe ever stated that his recommendation not to rehire Plaintiff was based on his previous speeding incidents.

Plaintiff also argues that "Lythgoe did not get along with Plaintiff and resented the fact that the latter often took time off for medical reasons." (Doc. 61 at 15.)  Plaintiff fails to adequately corroborate either assertion with evidence in the record.  Plaintiff cites to Azbill's deposition testimony in which the following exchange took place:

> Q. And do you recall Mr. Lythgoe ever having any issues with Mr. Richardson requesting sick leave or time off to take care of his wife?
>
> A. He could have. I don't have any specifics. You would have to ask him. But, like I say, he liked to keep things close at hand.

(Doc. 62 at 6 ¶ 32 (citing Doc. 62-2 at 16).)  Azbill's other testimony is equally as speculative.  This hardly establishes that Lythgoe "resented" Plaintiff taking time away from work for medical reasons.

Plaintiff also argues that "Lythgoe with[held] information from Meza about material and relevant facts regarding Plaintiff's wife's medical condition and plan to apply for FMLA leave on October 8, 2019." (Doc. 61 at 15–16.) As this Court established, there is no evidence establishing that Lythgoe was aware that Plaintiff's spouse was disabled or that he knew any facts regarding her medical condition. Plaintiff also argues that he was never asked "to explain the circumstances of his sudden resignation" "when there was an opportunity in May 2020 and again in 2022." (*Id.* at 16.) It is unclear how this establishes pretext, especially given that Plaintiff told Cervantes in his email that "[t]he personal and medical issues that resulted in my need to resign have been rectified." (Doc. 63-2 at 2.) It is unclear how the OIG not asking for further information regarding these "personal and medical issues" is relevant here.

Plaintiff also contends that his "positive evaluations alone are sufficient to create a triable issue of fact on the question of pretext." (Doc. 61 at 16.) First, none of the cases Plaintiff cites suggest as much. For example, the court in *Ader* merely indicated that positive performance review contributed to a finding that a claimant was discharged in retaliation for certain protected conduct. 465 F. Supp. 3d at 976. The other cases Plaintiff cites stand for the same proposition. *See, e.g.*, *Reese v. Barton Healthcare Sys.*, 693 F. Supp. 2d 1170, 1884–85 (E.D. Cal. 2010); *Blackman v. Omak Sch. Dist.*, 466 F. Supp. 3d 1172, 1187 (E.D. Wash. 2020). Of note, each of these cases involved a claimant who was discharged or placed on leave. In such cases, a claimant's past performance is particularly relevant in establishing pretext because it eliminates a commonly cited reason for discharge—poor performance. *See, e.g.*, *Reese*, 693 F. Supp. 2d. at 1183. Here, Plaintiff's past performance is borderline irrelevant in establishing pretext. Again, Defendant contends that Plaintiff was not rehired based on his resignation which is unrelated to his performance.

The Court makes clear that summary judgment is appropriate on Plaintiff's Rehabilitation Act claim based solely on the fact that Plaintiff fails to present evidence credibly establishing that the OIG knew that his spouse suffered from a degenerative bone

- 20 -

disease.  Neither does Plaintiff present any evidence suggesting that the OIG could draw such an inference about Plaintiff's spouse.  However, summary judgment would also be appropriate based on Plaintiff failing to present "specific and substantial" evidence demonstrating that he was not rehired based on his resignation.  *Liu*, 664 F. Supp. 3d at 1049 (citation modified).  Again, it is undisputed that Plaintiff resigned without prior notice and without any explanation.

**IV.   CONCLUSION**

Accordingly,

**IT IS ORDERED granting** Defendant's Motion for Summary Judgment (Doc. 57).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter final judgment and terminate this case.

Dated this 7th day of May, 2026.

Honorable Susan M. Brnovich
United States District Judge